UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DARNELL ROUTIER,

                          Plaintiff,                    NOT FOR PUBLICATION
                                                        **MEMORANDUM & ORDER**
          - against -                                   08-CV-02666 (CBA) (LB)

SERGEANT O'HARA PCT #113,
DETECTIVE BARRY BROWN PCT #113, and
DETECTIVE PAUL BROWN PCT #113,

                          Defendants.
-------------------------------------------------------------------x

AMON, Chief United States District Judge.

On June 26, 2008, plaintiff Darnell Routier, proceeding pro se, commenced this action

pursuant to 42 U.S.C. § 1983 against New York Police Department ("NYPD") officers Sergeant

Terrence O'Hara, Detective Barry Brown ("B. Brown") and Detective Paul Brown ("P. Brown").

He asserts that during his arrest on April 19, 2008, "he was shot by members of the [NYPD]"

and "brutally assaulted." (Compl. at 4.) Liberally construed, the complaint alleges claims of

false arrest, malicious prosecution and use of excessive force in violation of the Fourth and

Fourteenth Amendments and New York state law. Presently before the Court is defendants'

unopposed motion for summary judgment seeking to dismiss the complaint in its entirety. For

the reasons below, the Court grants defendants' motion for summary judgment in part and denies

it in part and directs Routier to inform this Court whether he intends to pursue his remaining

claims.

## BACKGROUND

Routier has failed to respond to defendants' motion for summary judgment or to

otherwise submit a statement of material facts pursuant to Local Rule 56.1. As a result, the

following facts are drawn from defendants' unopposed Local Rule 56.1 Statement and the

declarations and exhibits submitted in support of the instant motion, including the transcript of Routier's deposition.

Late in the evening on April 19, 2008, Routier went to a barber shop to get a haircut. (Routier Dep. at 65-68.) That same day, Sergeant O'Hara and non-parties Officer Liam Swords and Officer Denise Weston received a description of Routier and information that he was in a barber shop and in possession of a firearm. (Defs. R. 56.1 ¶ 4; O'Hara Decl. ¶¶ 3, 4; Kunz Decl., Ex. Q, at 1.) The officers, in plain clothes, proceeded to the barber shop, observed Routier inside and watched the location. (O'Hara Decl. ¶ 4.) Once his haircut was finished, Routier left the barber shop and entered a livery cab stand. (Routier Dep. 68-69; O'Hara Decl. ¶ 6.) A short time later, Routier and another man got into a Toyota Camry, which began driving away. (Routier Dep. 71-72; O'Hara Dep. ¶ 7.) Sergeant O'Hara and Officer Swords, in an unmarked police vehicle, followed the Camry, which came to a stop after traveling for several blocks. (Defs. R. 56.1 ¶¶ 5-6; O'Hara Decl. ¶¶ 8-9.)

At this point, the parties' versions of events diverge. According to defendants, Routier exited the Camry and ran from the officers who pursued him on foot. (Defs. R. 56.1 ¶¶ 7-9, 11; O'Hara Decl. ¶¶ 12-15.) Routier, however, testified at his deposition that he had asked the driver of the Camry to pull over so that he could "use the bathroom, number one" and that while he was standing by a tree near the car, he observed an individual running towards him with a gun. (Routier Dep. 72, 77-78.) Thinking that "he was going to rob [him] or something," Routier started running away. (Id. at 82.)

During the pursuit, the officers stated that they saw Routier carrying a black firearm. (Defs. R. 561. ¶ 12; O'Hara Decl. ¶ 13; Kunz Decl., Ex. Q, at 2-3.) In addition, according to a statement that R.R., the driver of the Camry, gave to the police, they shouted: "Police don't

2

move, stop, stop running." (Defs. R. 56.1 ¶ 27; R.R. Stmt. at 2.) Routier, the officers state, then fired one shot at them and appeared to be attempting to fire again. Both officers fired one shot each at Routier. (Defs. R. 56.1 ¶¶ 13-15; O'Hara Decl. ¶¶ 17-20; Kunz Decl., Ex. Q, at 2-3.) Struck by both bullets, Routier ran several feet before falling to the ground. (Defs. R. 56.1 ¶ 16; Routier Dep. 85-86; O'Hara Decl. ¶ 22.) The officers ran to where Routier had fallen to place him under arrest. (Defs. R. 56.1 ¶ 17; O'Hara Decl. ¶ 23.) According to the officers, Routier, while on the ground, tried to crawl toward the gun that he had dropped. (O'Hara Decl. ¶ 24.) Routier, meanwhile, suggests that he simply lay where he had fallen. (Routier Dep. 87.)

At this point, Routier testified, the officers "stomped" on him, kicking him twice in the back of the head and in the face and at least ten times in his stomach. They also hit him, Routier continued, at least twice in the head with the barrel of their guns. (Routier Dep. 87-92.) He stated further that he attempted to turn to block the blows but otherwise made no mention of physically countering the officers' force. (Id.) The officers, according to Routier, did not attempt to place him in handcuffs until after they had walked back to the Camry. (Id. at 94.)

The officers dispute this account, asserting that they approached Routier in order to place him in handcuffs and prevent him from reaching his gun. During this encounter, they claim, a short struggle ensued, with Routier "throwing punches, and trying to wrestle away from [him]." (Defs. R. 56.1 ¶ 20; O'Hara Decl. ¶¶ 25-26.) O'Hara injured his wrist during the struggle, an injury that required surgery and later resulted in retirement with a line-of-duty injury. (Defs. R. 56.1 ¶ 21; O'Hara Decl. ¶¶ 27-28; Kunz Decl., Ex. Q, at 3.) Beyond the force employed to subdue him during the struggle, the officers state that they did not "ever punch, kick, or strike Plaintiff with [their] weapon[s]." (O'Hara Decl. ¶¶ 31-32.) Non-party witness L.F., who heard and observed part of this encounter, testified to hearing two or more gunshots in a row and then

3

observing two plain-clothed police officers approach an individual lying on the ground, place him in handcuffs and pick him up and escort him away. (Defs. R. 56.1 ¶ 23-25; L.F. Dep. 7-8.) L.F. further stated that while watching this interaction, at no point did the officers kick, hit, punch or use their guns to strike Routier. (Defs. R. 56.1 ¶ 26; L.F. Dep. 8-9.)

Routier was taken from the scene by ambulance to a hospital where he was treated for gunshot wounds to his right forearm and right shin. (Kunz Decl., Ex. Q, at 5; Routier Dep. 85-86, 96.) A photograph of Routier taken while in the hospital on that night or early the next morning reveals no visible injuries to his face or chest. (Defs. R. 56.1 ¶ 22; Kunz Decl., Ex. N.)

Sergeant O'Hara and Officer Swords were the only officers present prior to and during Routier's arrest. (Defs. R. 56.1 ¶ 34; O'Hara Decl. ¶¶ 8-30; B. Brown Decl. ¶ 8; P. Brown Decl. ¶¶ 4-6; Kunz Decl., Ex. Q, at 2-3 .) Detective Barry Brown arrived on the scene after the shooting while Routier was already in the ambulance in the care of Emergency Medical Technicians. (Defs. R. 56.1 ¶ 35; B. Brown Decl. ¶¶ 5, 9.) He was assigned to serve as the arresting officer for Routier's arrest. (Defs. R. 56.1 ¶ 36; B. Brown Decl. ¶ 6.) After Routier had been taken to the hospital, Detective Paul Brown, a Crime Scene Unit investigator, arrived on the scene to investigate and collect evidence. (Defs. R. 56.1 ¶¶ 39-40; P. Brown Decl. ¶¶ 3-6.) During his deposition, Routier testified that he would be willing to dismiss Detectives P. Brown and B. Brown because "they had nothing to do with it." (Defs. R. 56.1 ¶ 41; Routier Dep. 169.) He also stated, however, that he had named Barry Brown because he thought he was the second officer who had chased him, suggesting that he intended to pursue this action against Officer Swords instead. (Routier Dep. 166.)

Among the items collected at the scene were a gun recovered from the area where Routier fell and bullets. (Defs. R. 56.1 ¶¶ 19, 29-33; Kunz Decl., Ex. L., at 4, 6; Ex. Q, at 5.)

4

Analysis of the gun revealed that it was operable and that evidence of discharge was present. (Defs. R. 56.1 ¶ 28; Kunc Decl., Exs. K, Q.)  A bullet recovered from the scene was compared to test-fired shots from the gun, indicating that the bullet was fired from the gun recovered during Routier's arrest.  (Defs. R. 56.1 ¶¶ 29-33; Kunz Decl., Exs. J, M.)  Routier was arrested for and subsequently charged with Criminal Possession of a Weapon in the Second Degree under New York Penal Law § 265.03(1)(B).  (Defs. R. 56.1 ¶¶ 1-2; Kunz Decl., Ex. B, Ex. D at 9.)

On June 26, 2008, prior to the resolution of the state criminal weapons possession charge, Routier initiated the instant action in this Court.  In his complaint, Routier alleges that he was shot by Sergeant O'Hara, Detective P. Brown and Detective B. Brown while he "was minding [his] own business."  (Compl. at 4.)  He claims, moreover, that the officers then "brutally assaulted" him and "tortur[ed] [him] by pressing their feet and hands into [his] bullet wounds." (Id.)  He states further that as he yelled in pain, the officers "torment[ed] [him] by saying, 'Look what your blackass made me do, today I should have killed you,['] and then hit [him] in the head with [a] gun barrel."  (Id.)  As a result of the officers' actions, Routier claims that he suffered gunshot wounds to his right arm and right leg, massive blood loss and hand trauma.  (Id.)  Aside from unspecified injunctive relief, he seeks from each defendant $10 million in punitive damage and $10 million in compensatory damages. (Id. at 5.)

On November 21, 2008, this case was stayed pending the outcome of Routier's parallel criminal prosecution in New York State Supreme Court (DE #17), which was resolved when Routier pleaded guilty to Criminal Possession of a Weapon in the Second Degree on December 22, 2010 (Defs. R. 56.1 ¶ 2; Kunz Decl., Ex. C, at 8-9).  He was sentenced to fourteen years' imprisonment with five years of post-release parole supervision.  (Kunz Decl., Ex. C, at 10.) During his allocution, he admitted "that on April 19, 2008 in Queens County, [he] knowingly

possessed a loaded firearm, that being a pistol, with the intent to use it unlawfully against another." (Defs. R. 56.1 ¶ 3; Kunz Decl, Ex. C., at 9.)

On April 14, 2011, defendants notified the Court that Routier's state criminal case had ended. (DE #50.) The next day, the Court ordered the Superintendent of the correctional facility in which Routier was held to make Routier available for a telephone conference in this action. (DE #51.) On July 18, 2012, after a year of discovery, defendants moved for summary judgment on all claims. (DE #77.) On September 7, 2012, after filing their motion with the Court electronically, defendants wrote to the Court stating that, to date, Routier had not served them with an opposition to their motion for summary judgment. As a result, on January 22, 2013, this Court ordered Routier to respond to defendants' motion within thirty (30) days and that if he failed to respond, the motion would be considered unopposed. (DE #82.) The Court has to date received no response from Routier and thus considers defendants' motion for summary judgment unopposed.

## DISCUSSION

The Court liberally construes Routier's pro se complaint to assert § 1983 claims of false arrest, malicious prosecution and use of excessive force in violation of the Fourth and Fourteenth Amendments of the Constitution, as well as analogous state law claims of false arrest, malicious prosecution and assault and battery. Defendants contend that they are entitled to summary judgment on all of these claims on the grounds that: (1) Routier's criminal conviction bars any false arrest or malicious prosecution claims; (2) the officers' use of force was reasonable or, alternatively, they are entitled to qualified immunity; (3) any excessive force claims against Detectives P. Brown and B. Brown fail because they lacked personal involvement; and (4) the Court should either dismiss any state claims for the same reasons the federal claims fail or

6

decline to exercise jurisdiction.  For the following reasons, the motion is granted in part and
denied in part.

## I.  Standard of Review

Summary judgment is appropriate when the pleadings and evidence that would be
admissible at trial show that there is "no genuine issue as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d
290, 309 (2d Cir. 2008).  The Court's function is not to resolve disputed issues of fact but only to
determine whether there is a genuine issue to be tried.  See Anderson, 477 U.S. at 249.

The moving party carries the burden of demonstrating the absence of a genuine issue for
trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The reviewing court is required to
view the evidence in the light most favorable to the non-moving party and to resolve all
reasonable inferences and ambiguities against the moving party.  See Adickes v. S.H. Kress &
Co., 398 U.S. 144, 157 (1970); Salvino, 542 F.3d at 309.  Additionally, "[a] pro se party's
submissions are to be read liberally, a requirement that is especially strong in the summary
judgment context, where a pro se plaintiff's claims are subject to a final dismissal." Ferguson v.
Bizzario, No. 09 Civ. 8106, 2010 WL 4227298, at *3 (S.D.N.Y. Oct. 19, 2010); Erickson v.
Pardus, 551 U.S. 89, 94 (2007) (noting that pro se submissions are to be construed liberally and
held to less stringent standards than those drafted by attorneys); see also LaFrance v. Bemben,
No. 10-CV-4583, 2013 WL 132702, at *1 (E.D.N.Y. Jan. 10, 2013).  Nevertheless, the non-
moving party cannot rest on mere allegations, speculation or denials.  See Fed. R. Civ. P. 56(e);
Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  "Instead, the non-movant must produce

specific facts indicating that a genuine factual issue exists." Scotto, 145 F.3d at 114 (internal quotation marks omitted).

When, as here, a non-moving party fails to oppose a summary judgment motion, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e). An unopposed summary judgment motion, however, may fail "where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (internal quotation marks omitted); see also N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 132 (2d Cir. 2008) (noting that "an opposing party's failure to controvert a fact in a Rule 56.1 statement does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law" (internal quotation marks omitted)). In addition, even "where the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'" Vt. Teddy Bear Co. , 373 F.3d at 244 (quoting Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001)). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." Id. (internal quotation marks omitted).

"In reviewing and evaluating the evidence in support of an unopposed motion for summary judgment, the movant's Rule 56.1 statement is 'an important guide.'" Polanco v. 34th St. P'ship, 724 F.Supp.2d 420, 425 (S.D.N.Y. 2010) (quoting Shark v. City of New York, No. 03 Civ. 2616, 2008 WL 4444112, at *3 (S.D.N.Y. Sept. 29, 2008)); see also Levitant v. City of New

York Human Res. Admin., 08-CV-397, 2012 WL 6212695, at *2 (E.D.N.Y. Dec. 13, 2012). The

court, however, "must be satisfied that the citation to evidence in the record supports the

assertion[s]" of undisputed facts contained therein. Vt. Teddy Bear, 373 F.3d at 244; see also

Grandeau, 528 F.3d at 132 ("[A] Rule 56.1 statement is not itself a vehicle for making factual

assertions that are otherwise unsupported in the record." (internal quotation marks omitted)).

With these standards in mind, the Court turns to Routier's claims.

## II.  False Arrest and Malicious Prosecution

Claims for false arrest and malicious prosecution under § 1983 are "substantially the

same" as their counterparts under New York law. See Boyd v. City of New York, 336 F.3d 72,

75 (2d Cir. 2003); Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). The analysis of the state

and federal claims are, therefore, identical and, accordingly, rise and fall together. Boyd, 336

F.3d at 72.

### A.  False Arrest

A claim for false arrest brought under § 1983 or New York law requires proof that: "(1)

the defendant intentionally confined [the plaintiff], (2) the plaintiff was conscious of the

confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was

otherwise privileged." Jocks, 316 F.3d at 134-35. The confinement is privileged if probable

cause exists at the time of the arrest. Id. at 135; Henning v. City of New York, No. 09-CV-3998,

2012 WL 2700505, at*4 (E.D.N.Y. July 5, 2012). The existence of probable cause, therefore, "is

an absolute defense to a false arrest claim." Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006).

Probable cause for the arrest is conclusively established where there is a valid prosecution

resulting in a conviction, including where the individual is convicted upon a guilty plea. See

Thomas v. Roach, 165 F.3d 137, 144 (2d Cir. 1999) (citing Cameron v. Fogarty, 806 F.2d 380,

9

388-89 (2d Cir. 1986); Roundtree v. City of New York, 778 F. Supp. 614, 619 (E.D.N.Y. 1991));
see also Rivera v. City of Yonkers, 470 F. Supp. 2d 402, 407 (S.D.N.Y. 2007).

Routier's guilty plea to second-degree criminal possession of a weapon, the same crime
for which he was arrested, establishes probable cause for his arrest, and this bars any federal or
state claim for false arrest. Accordingly, defendants' motion for summary judgment on Routier's
false arrest claims is granted.

## B. Malicious Prosecution

Routier's guilty plea also bars Routier's § 1983 and state law claims for malicious
prosecution. A claim for malicious prosecution requires proof of four elements: "(1) the
initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the
proceedings in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and
(4) actual malice as a motivation for defendant's actions." Manganiello v. City of New York,
612 F.3d 149, 160-61 (2d Cir. 2010) (internal quotation marks omitted). As with a false arrest
claim, "the existence of probable cause is a complete defense to a claim of malicious prosecution
in New York," Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003), and a guilty plea
establishes the requisite probable cause, see Houston v. City of New York, No. 06 CV 2094,
2013 WL 1310554, at *4 (E.D.N.Y. Mar. 28, 2013). A plaintiff's guilty plea also bars a
malicious prosecution claim because it "precludes a finding of 'termination of the proceedings in
[plaintiff's] favor.'" Larocco v. Jackson, No. 10-CV-01651, 2012 WL 760396, at *3 (E.D.N.Y.
Mar. 8, 2012) (quoting Manganiello, 612 F.3d at 160-61); see also Williams v. Young, 769 F.
Supp. 2d 594, 602 (S.D.N.Y. 2011); cf. Cameron, 806 F.2d at 387 ("[T]he fact that the person
against whom criminal proceedings are instituted is guilty of the crime charged against him, is a

complete defense against liability for malicious prosecution." (internal quotation marks omitted)).

Since Routier cannot establish two elements of a claim for malicious prosecution, the Court grants summary judgment in favor of defendants on Routier's federal and state malicious prosecution claims.

## III. Excessive Use Force

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010). To maintain a claim of excessive force, a plaintiff must establish that the officer's use of force "is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). Whether the force used in connection with the arrest is reasonable depends on a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted); Felmine v. City of New York, No. 09-CV-3768, 2011 WL 4543268, at *18 (E.D.N.Y. Sept. 29, 2011). This balancing requires close examination of the totality of the circumstances in each particular case, including whether the suspect poses a threat to the safety of others, resists or attempts to evade arrest, and the severity of the crime at issue. See Graham, 490 U.S. at 396; Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000); Felmine, 2011 WL 4543268, at *18. In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

11

necessary in a particular situation." Graham, 490 U.S. at 396-97. At the summary judgment stage, because of the "fact-specific nature" of the objective reasonableness inquiry, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty America v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004). Thus, to prevail on a motion for summary judgment, the evidence must show that "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995).

Routier's complaint suggests two separate instances of alleged excessive force: (1) the officers' use of deadly force in shooting at him while in pursuit, and (2) their "brutal[] assault" and "tortur[e]" after he had been shot. The Court discusses each separately below.

## A. Personal Involvement of Paul Brown and Barry Brown

Before delving into the substance of this claim, the Court dismisses any excessive force claims against Detectives P. Brown and B. Brown. "'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010). As the record and Routier's own admission make clear, neither Detective P. Brown nor Detective B. Brown was personally involved in the excessive force allegations in this case. Indeed, neither detective was even present at the time of the arresting incident when the alleged excessive force was employed. Detective B. Brown arrived on the scene after Routier was already being treated in the ambulance, while Detective P. Brown did not arrive until after Routier had already been transported to the hospital. (B. Brown Decl. ¶¶ 5, 9; Decl. P. Brown

12

¶¶ 3-6.)  Indeed, Routier himself acknowledged their lack of involvement.  When asked during his deposition whether he would be willing to dismiss Detectives B. Brown and P. Brown from the case, Routier responded, "Yeah, they had nothing to do with it. . . . [Y]eah, I am willing for Paul and Barry."  (Routier Dep. 169.)  Accordingly, any claims of excessive force against Detectives B. Brown and P. Brown are dismissed.

### B. Deadly Force

It is undisputed that Sergeant O'Hara and Officer Swords shot at Routier and that he sustained two gunshot wounds as a result.  (See id. at 84-87.)  The decision to use deadly force is "'objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  Rasanen v. Brown, 841 F. Supp. 2d 687, 697 (E.D.N.Y. 2012) (quoting Nimely v. City of New York, 414 F.3d 381, 390 (2d Cir. 2005); cf. Tennessee v. Garner, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend [a felon] does not justify the use of deadly force to do so.").  "The reasonableness of the officer's decision depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."  Cowen ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 762 (2d Cir. 2003) (internal quotation marks omitted).

Defendants contend that the record establishes that Routier fired a gun at the officers while he fled from them and that the officers therefore reasonably believed that Routier posed a significant threat of death or serious injury justifying deadly force.  Routier counters in his complaint that Sergeant O'Hara and Officer Swords shot him while he "was minding [his] own business."  In addition, he maintained in his deposition, taken after his guilty plea in the parallel

13

state prosecution for criminal possession of a weapon, that he was chased without provocation and did not have a gun that night. (Routier Dep. 75-87, 102-05.) However, because Routier's guilty plea in the state case bars him from claiming that he was not in possession of a loaded firearm on the night in question, there is no evidence in the record contradicting the officers' account that Routier fired the gun at them while running from them on that night. This silence in the record in conjunction with the other evidence produced to support defendants' motion demonstrates that the officers' decision to utilize deadly force was objectively reasonable.

"[I]ssues actually litigated in a state-court proceeding are entitled to the same preclusive effect in a subsequent federal § 1983 suit as they enjoy in the courts of the State where the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 83 (1984); see Sullivan, 225 F.3d at 166. Under New York law, the collateral estoppel doctrine precludes a party from relitigating an issue "'if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action.'" Sullivan, 225 F.3d at 166 (quoting Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d 343 (1999)). Where, as here, the first action culminated in a guilty plea, that plea "conclusively establishes the factual predicate for the offense to which the defendant is pleading guilty." United States v. Gregg, 463 F.3d 160, 164 (2d Cir. 2006). Thus, a plaintiff in a § 1983 action like Routier is collaterally estopped from denying facts to which he admitted during a state plea allocution. See Barmapov v. Barry, No. 09-CV-03390, 2011 WL 32371, at *6 (E.D.N.Y. Jan. 5, 2011); Biggs v. City of New York, No. 08 Civ. 8123, 2010 WL 4628360, at *5 (S.D.N.Y. Nov. 16, 2010).

Routier admitted during his plea allocution that he "knowingly possessed a loaded firearm, that being a pistol, with the intent to use it unlawfully against another." (Kunz Decl.,

14

Ex. C, at 9.) As a result, Routier is collaterally estopped from denying here that he had a loaded gun that night and that he intended to use it.[1] However, aside from this denial and general statements that the officers shot him without provocation, Routier has not set forth any specific facts that contradict the officers' account of the shooting. What Routier's alternate version of events would have been had he admitted that he had had a gun that night is thus largely speculative.

Moreover, defendants have put forth convincing evidence that while running away from the officers Routier not only intended to use the gun but in fact did. Analysis of the gun that Routier pleaded guilty to possessing confirmed that the gun was operable, that it had been discharged, and, when test-fired, that it emitted bullets matching one found at the scene. (Kunz Decl., Exs. J, K, M, Q.) This scientific evidence is not disputed. In addition, the statements of R.R., who stated that he heard three gunshots, and L.F., who testified to hearing at least two gunshots in rapid succession, provide some corroboration for the officers' claims that they were involved in a gunfire exchange with Routier. (Kunz Decl., Ex. P, at 2; L.F. Dep. 6-7.) R.R also stated that he heard the officers yell "Police, don't move, stop, stop running" followed by three gunshots, testimony that supports the officers' account that Routier fired his gun after defendants had identified themselves as police officers and ordered him to stop running and only then did they fire back twice. (R.R. Stmt. at 2; see also Kunz Decl., Ex. Q, at 2-3.) Although Routier testified that he did not hear the officers shout anything (Routier Dep. 92-93), that he did not hear the statement does not mean it was not said.

The record thus establishes that Routier possessed a loaded firearm that he shot while

---

[1] Although it is not necessary to reach this issue, Routier would also likely be judicially estopped from denying he was in possession of a weapon on the night in question. See Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993) ("The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding."); Garcia v. Greco, No. 05 Civ. 9587, 2010 WL 446446, at *6 (S.D.N.Y. Feb. 9, 2010).

running away from police officers who had identified themselves and called for him to stop. Under these circumstances, it was objectively reasonable for the officers to believe that Routier posed a significant threat of death or serious physical injury to both the officers and the public. As such, the officers were justified in responding to Routier's actions with deadly force. See Stevens v. Metropolitan Transp. Auth. Police Dep't, 293 F. Supp. 2d 415, 420 (S.D.N.Y. 2003) (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)); Diggs v. N.Y. Police Dep't, No. 04-CV-1849, 2005 WL 3533158, at *4 (E.D.N.Y. Dec. 22, 2005) ("If a suspect threatens an officer with a weapon, the officer may use deadly force in response."); see also Biggs, 2010 WL 4628360, at *5 (concluding that plaintiff's admission during plea allocution that he had threatened and endangered officer by "pointing and waving a knife in close proximity to" the officer provided factual record that justified officer's use of deadly force). Accordingly, defendants' motion for summary judgment as to Routier's excessive force claim is granted with respect to the officers' use of deadly force while in pursuit.

### C. Post-Shooting Force

#### 1. Reasonableness of the force

Routier also alleges that the officers exerted an unreasonable use of force after he was shot. As Routier states in his complaint, at this point, the officers "brutally assaulted" him, "tortur[ed]" him, "press[ed] their feet and hands into [his] bullet wounds," and "hit [him] in the head with [a] gun barrel." Defendants contend that these allegations are "far fetched" and "fanciful" and that, grounded in such improbabilities, Routier's excessive force claim cannot withstand summary judgment.

The evidence in the record of the officers' post-shooting use of force and the facts and circumstances confronting them at that time is comprised of four main items: (1) the officers'

account of the events in Sergeant O'Hara's declaration and summarized in an internal police report; (2) non-party witness L.F.'s description of his observations of the encounter; (3) a photograph of Routier taken at the hospital on the night of the incident; and (4) Routier's narrative of the events in his deposition testimony, which, even though the motion is unopposed, the Court must nevertheless consider, see Sloane v. Getz, 150 Fed. App'x 86, 88 (2d Cir. 2005) (vacating grant of unopposed motion for summary judgment on excessive force claim where plaintiff's deposition testimony regarding force exerted created a material issue of disputed fact).

Based on the officers' statements, any post-shooting force exerted was used to subdue a dangerous suspect who was attempting to arm himself and flee and who was violently resisting arrest. To support their claim of a struggle, they point to Sergeant O'Hara's wrist injury. In addition, that only minimal force was applied is corroborated, they assert, by the photograph of Routier revealing no visible injuries to his face or chest and the testimony of eyewitness L.F. that the officers did not kick, hit, punch or use their guns to strike Routier or press their hands and feet into his wounds but simply approached Routier, placed him handcuffs and picked him up and escorted him away. If these were the only facts in evidence, the Court would have no trouble finding the officers' conduct objectively reasonable as an effort to subdue a dangerous individual who was trying to arm himself and who was physically and aggressively resisting arrest. See, e.g., Garcia v. Greco, No. 05 Civ. 9587, 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010) (due to "Defendant's interest in preventing the escape of a gun-wielding fugitive, as well as his interest in the safety of his fellow officers," granting summary judgment on excessive force claim where plaintiff alleged defendants knocked him down and hit him with their fists and radios even though he did not resist arrest); Kalfus v. New York & Presbyterian Hosp., 476 Fed. App'x 877, 880-81 (2d Cir. 2012) (affirming grant of summary judgment and finding

17

patrolmen's conduct "reasonable force to overcome [plaintiff's] resistance" where they "turned [plaintiff] onto his stomach, pulled his arms behind his back, placed handcuffs on him, and lifted him onto his feet by pulling on his upper arms, sweatshirt, and waist"); see also Sullivan, 225 F.3d at 166 ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force . . . ."); cf. Curry v. City of Syracuse, 316 F.3d 324, 332 (2d Cir. 2003) (noting that plaintiff can "prevail on his excessive force claims if he is able to show that [defendant] used more force than was necessary to subdue him").

Routier's statements in his deposition, however, paint a very different picture. According to his testimony, Routier had fallen after being shot and was simply lying on the ground when the officers began repeatedly kicking and hitting him in the head, face and stomach. Other than turning to protect himself from the officers' blows, he did not physically resist; nor was he reaching for his gun. Were the Court to credit this set of facts, the officers' actions would amount to repeated gratuitous blows to an individual who for the most part was already subdued—almost certainly excessive force under such circumstances. See, e.g., Davis v. City of New York, No. 04-CV-329, 2007 WL 755190, at *12 (E.D.N.Y. Feb. 15, 2007) (refusing to grant summary judgment where plaintiff testified that the officer kicked her in the shoulder, without any provocation or resistance on her part, while she was lying on the floor in handcuffs); Lemmo v. McKoy, No. 08-CV-4264, 2011 WL 843974, at *6 (E.D.N.Y. Mar. 8, 2011) (noting that "gratuitous uses of force that are not required to subdue an individual likely fail the Graham objective unreasonableness test"); Sash v. United States, 674 F. Supp. 2d 531, 539 (S.D.N.Y. 2009) (holding that tackling and throwing plaintiff up against a metal gate could be excessive force where plaintiff offered no resistance); Williams v. City of New York, No. 06 CV 6601,

18

2009 WL 3254465, at *1, *7-*8 (E.D.N.Y. Oct. 9, 2009) (denying summary judgment on excessive force claim where plaintiff alleged officers "rushed and tackled him," slamming him to the ground and jumping on him, even though he did not struggle or resist).

In light of these competing pictures of the events in question, whether the officers' post-shooting use of force was objectively reasonable depends almost entirely on credibility assessments of Routier, the officers and L.F. and choices between the conflicting versions of events they describe. It is well settled that on summary judgment, "a district court generally 'should not weigh evidence or assess the credibility of witnesses.'" Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)). More specifically, where, as here, the resolution of an issue rests largely on "[a]ssessments of credibility and choices between conflicting version of the events," that issue then is a "matter[] for the jury" and not one the court can decide on summary judgment. Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005) (internal quotation marks omitted); McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) ("It is a settled rule that '[c]redibility assessments, choices between conflicting versions of events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." (quoting Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)).

Defendants nevertheless argue that summary judgment is warranted because Routier's allegations in regard to the post-shooting use of force "are so inconsistent, unsupported, and far-fetched that no reasonable jury could possibly believe him." (Defs' Mem. at 17.) In doing so, they suggest that this is one of the "extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast upon their plausibility,'" allowing the court to "'piece the veil of the complaint's factual allegations and dismiss the claim.'" Rojas, 660 F.3d at 106 (quoting

19

Jeffreys, 426 F.3d at 555); Shabazz v. Pico, 994 F. Supp. 460, 469-71 (S.D.N.Y. 1998).

Routier's testimony and allegations here, however, are not "so replete with inconsistencies and

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to

credit" them. Jeffreys, 426 F.3d at 555 (internal quotation marks omitted); Hamilton, Nos. CV-

07-3633, CV-07-3825, 2009 WL 2226105, at *9 n.15 (E.D.N.Y. July 23, 2009) (declining to

discredit plaintiff's testimony regarding excessive force claim despite lack of other direct

evidence where it "is neither inconsistent nor does it contain undoubted probabilities").

 First, defendants are incorrect in claiming that Routier's description of the officers' use of

force irreconcilably "morphed" between his complaint and his deposition. Although he appears

to have backed off from his initial allegation that the officers "presse[ed] their feet and hands

into [his] bullet wounds," Routier's testimony that the officers repeatedly kicked and hit him

with their guns in the head, face and stomach is completely consistent with the allegations in his

complaint that the officers "brutally assaulted" him, "tortur[ed]" him and "hit [him] in the head

with [a] gun barrel."

 In addition, although defendants argue that the photograph taken of Routier that night

revealing no visible injuries to his face or chest likewise demonstrates the improbability of

Routier's allegations, the slightness of injury suffered as a result of the challenged use of force

does not make that force objectively unreasonable as a matter of law. See Robison v. Via, 821

F.2d 913, 924 (2d Cir. 1987) (noting that although a jury may consider the lack of serious injury

as evidence that the implemented force was not excessive, it does not entitle defendants to

judgment as a matter of law); Felmine, WL 4543268, at *19 ("The law of this circuit . . . does

not appear to place a demanding requirement on excessive force plaintiffs to demonstrate

injury."). Particularly where, as in this case, the alleged use of force could have resulted in

20

serious injury, that the plaintiff avoided that fate does not alter the reasonableness of that

application of force. See Wilkins v. Gaddy, 559 U.S. 34, 130 S. Ct. 1175, 1178-79 (2010)

(noting in the Eighth Amendment context that "[a]n inmate who is gratuitously beaten by guards

does not lose his ability to pursue an excessive force claim merely because he has the good

fortune to escape without serious injury"); see also Allen v. City of New York, 480 F. Supp. 2d

689, 708-09 (S.D.N.Y. 2007) (finding allegation of force that "entail[ed] a risk of severe injury"

but resulted in injuries that did not appear "particularly grave" sufficient to survive summary

judgment); see also Adedeji v. Hoder, No. 09-CV-04046, 2013 WL 1233501, at *7 (E.D.N.Y.

Mar. 27, 2013) ("[T]he fact that [the plaintiff] may have suffered only de minimis injuries . . .

does not invalidate the jury's conclusions about the excessiveness of the force used."). 

Defendants, moreover, overstate the strength of this evidence.  A photograph is not definitive

medical proof of the lack of injuries.  Routier testified that he sustained a neck injury,

experienced persistent pain in his back and that the officers' blows to his head exacerbated his

vision problems, none of which would have been apparent in a photograph.  (Routier Dep. 123-

25.)

　　　　Finally, although the testimony of L.F. largely corroborates the officers' version of

events, it is for a jury to determine its credibility and the weight it should receive.  A reasonable

jury could, for example, credit L.F's testimony and nevertheless believe not only that Routier did

not resist arrest but also that whatever force the officers did apply was objectively unreasonable

under those circumstances.  Accordingly, this case does not present the "rare circumstance"

where the plaintiff's testimony is so riddled with inconsistencies and improbabilities that the

Court is "'authorized to pierce the veil of the complaint's factual allegations,' dispose of '[s]ome

improbable allegations', and dismiss the claim." Shabazz, 994 F. Supp. at 470-01 (quoting

21

Denton v. Hernandez, 504 U.S. 25, 32, 33 (1992)); see also Smith v. Fields, No. 95 CIV. 8374, 2002 WL 342620 at *6 (S.D.N.Y. Mar. 4, 2002) ("Although the apparent lack of any indication in the medical records suggesting that Plaintiff was in fact slapped and kicked about the head casts some doubt on his claim, it is for the fact finder to determine the veracity of the Plaintiff's account and whether his allegations, even if standing alone, amount to excessive force."). Summary judgment on the basis that the officers' post-shooting conduct was objectively reasonable as a matter of law is therefore denied.

### 2. Qualified Immunity

For substantially the same reasons, the Court also rejects defendants' alternative argument that Routier's claims are barred because the officers are entitled to qualified immunity.

Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In determining whether a defendant is entitled to qualified immunity, a court employs a two-pronged analysis that asks (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." See id. at 232 (internal citations omitted); Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010).

Applying that analysis here, it is clear that if Routier's account is credited, the officers would not be entitled to qualified immunity on Routier's post-shooting excessive force claim because a reasonable officer would have known that repeatedly kicking and hitting with his fists and gun a passive suspect in the head, face and stomach did not comport with that individual's

22

clearly established constitutional right not to be subjected to excessive force during arrest. Thus, if a jury were to determine that Routier's version of events is accurate, this case "would not involve 'the hazy border between excessive and acceptable force,' but rather the violation of a clearly established right for which qualified immunity is unavailable." Davis, 2007 WL 755190, at *16 (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)). Indeed, in excessive force cases, the qualified immunity and excessive force analyses often "converge on one question: [w]hether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." Breen, 352 F.3d at 764 & n.7; Lemmo, 2011 WL 843974, at *8 ("Having determined that plaintiff's excessive force claim presents triable issues of fact, [the court] necessarily and likewise conclude[s] that defendant . . . is not entitled to summary judgment on his defense of qualified immunity."). Accordingly, because, as discussed above, what actions the officers took and the circumstances they confronted are issues that cannot be decided by the Court at this juncture, whether the officers are entitled to qualified immunity also remains in dispute. See Breen, 352 F.3d at 764; Pierre-Antoine v. City of New York, No. 04 Civ. 6987, 2006 WL 1292076, at *6 (S.D.N.Y. May 9, 2006) (finding defendant not entitled to qualified immunity where there were genuine issues of material fact with respect to the reasonableness of defendant's use of force). Defendants' motion for summary judgment with respect to Routier's post-shooting excessive force claim is therefore denied.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment with respect to Routier's federal and state false arrest and malicious prosecution claims. With respect to Routier's excessive force claims, the Court dismisses any excessive force claim against Detectives P. Brown and B. Brown and also grants summary judgment to defendants on

Routier's deadly force claim.  The Court, however, denies summary judgment on Routier's remaining post-shooting excessive force claim and any related state law claims of assault and battery.

Because Routier failed both to oppose this motion for summary judgment and to respond to the Court's January 22, 2013 Order directing Routier to respond to the motion, it is unclear to the Court whether he intends to continue to prosecute this action.  Accordingly, if Routier intends to proceed, he is directed to submit a letter to the Court within thirty (30) days of the date of this Order stating that he will pursue his remaining claims.  The Court also advises that if he seeks the assistance of counsel that he should submit a request for the appointment of counsel.  If Routier fails to comply with this Order within thirty (30) days, the Court will dismiss this action due to Routier's failure to prosecute.

SO ORDERED.

Dated: Brooklyn, New York
    July    16   , 2013

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge